UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TERRY BORGIA,

    Petitioner,

Case No. 2:16-cv-11768

v.

HONORABLE STEPHEN J. MURPHY, III

ANTHONY STEWART,

    Respondent,
_____/

**OPINION AND ORDER DENYING PETITION
FOR WRIT OF HABEAS CORPUS AND DECLINING TO ISSUE A
CERTIFICATE OF APPEALABILITY OR LEAVE TO APPEAL IN FORMA PAUPERIS**

Petitioner Terry Borgia, confined at the Huron Valley Women's Correctional Facility in Ypsilanti, Michigan, seeks the issuance of a writ of habeas corpus pursuant to 28 U.S.C. § 2254. In her pro se application, Borgia challenges her conviction for first-degree felony murder, Mich. Comp. Laws § 750.316(1)(b), and first-degree child abuse, Mich. Comp. Laws § 750.136(2). For the reasons stated below, the Court will deny the application for writ of habeas corpus.

**BACKGROUND**

Borgia was convicted following a jury trial in the Macomb County Circuit Court. The Court presumes the relevant facts relied upon by the Michigan Court of Appeals are correct, *see Wagner v. Smith*, 581 F.3d 410, 413 (6th Cir. 2009), and recites them verbatim:

> This case arises from the drowning of a small child that occurred on January 11, 2010, in Clinton Township, Michigan. On the morning of January 11, 2010, defendant was present in her apartment in Clinton Township with her daughter Tonina Borgia and her grandson, DT. DT was the son of

1

defendant's other daughter, Amy Alkasmikha; defendant and Tonina were babysitting DT on January 11, 2010. DT was four years old. Between 7:00 a.m. and 8:00 a.m., a 911 call was made from defendant's home to report a drowned child. A group of firefighters were the first to arrive on the scene; when they arrived at the apartment, they found that no lights were on and the front door of the apartment was locked. After the firefighters knocked on the front door for approximately 10 to 15 seconds, defendant opened the door and let them into the apartment. Defendant appeared calm, and she said nothing as she led the firefighters into the interior of the apartment. Defendant led the firefighters to a bathroom along the main hallway of the apartment; inside, DT was lying on his back, unconscious, on the bathroom floor. Tonina was kneeling next to DT in the bathroom, speaking to an unknown person on a cordless phone.

As firefighters began first aid procedures on DT, Mark Turo, one of the firefighters present, questioned defendant about what had happened. Defendant told Turo that DT had been sleeping on the couch in the living room of the apartment, and that approximately one hour before the firefighters arrived, she placed him in the bathtub. Defendant stated that she had not checked on DT after she placed him in the bathtub. Turo stated that neither defendant nor Tonina could answer his basic questions about DT's background, including what his last name was and what his birthday was. Defendant also initially told Turo that she was DT's mother. Preston Susalla was one of the first police officers to arrive on the scene; she also questioned defendant and Tonina about what had happened to DT.  Susalla stated that defendant was calm and emotionless throughout their conversation; however, Tonina was hysterical. Defendant told Susalla that "approximately 10 minutes after waking up she went into the bathroom and filled the bathtub, filled it with water."  Defendant told Susalla that "[a]fter filling the bathtub with water, she then walked into the living room where DT was sleeping on the couch, and she picked him up and then proceeded to walk into the bathroom where she [had] filled the tub full of water." Defendant stated that she placed DT in the tub, with his pajamas still on, and then walked into the kitchen; she also stated that she did not check on him for 25 minutes until Tonina discovered him.

Leo Melise, a police detective, also interviewed defendant at the apartment. Defendant told Melise that she had awoken at approximately 6:00 a.m. that morning, brushed her teeth, showered, and then she ran a bath for DT. Defendant told Melise that she placed DT in the bathtub with his pajamas still on, and then walked away. After defendant spoke with Melise, she was arrested and transported to a police station. Police officers discovered five inches of standing water in the bathtub; additionally, the floor around the bathtub was wet.  Police officers also recovered wet children's pajamas and a wet mop from the apartment.

2

DT was declared deceased at a hospital after being transported from the apartment in an ambulance, and an autopsy was performed. Daniel Spitz, who performed the autopsy, observed bruising on DT's scalp and neck that were consistent with physical trauma. Additionally, Spitz found petechiae around DT's eyes; he stated that petechiae are broken blood vessels that form in response to increased pressure in the head and face. Spitz also found tearing inside DT's lip that was consistent with his lips having been pressed hard against his teeth. Spitz determined that DT's cause of death was forced submersion and drowning, and also that the manner of death was homicide.

Throughout the trial, defendant's counsel argued that defendant was attempting to falsely take responsibility for DT's death in an attempt to protect Tonina; defense counsel argued that Tonina actually killed DT. Vicky Antishin, defendant's other daughter, testified that she believed Tonina was responsible for DT's death. Specifically, Vicky testified that several days after DT's death, Tonina was staying at her house, and Tonina had spoken around her children with "satanic talk." Further, Vicky stated that Tonina attempted to kidnap one of Vicky's children by pulling the child out the front door of Vicky's house on the same day. Additionally, Vicky stated that Tonina had confessed to killing DT one day as the two were driving together to one of defendant's court dates. Vicky also testified that DT was exceptionally strong for a small child, and that defendant would have been unable to physically overpower him.

Tonina was not present for defendant's trial; however, Tonina's November 30, 2012 testimony, from one of defendant's prior mistrials [1], was read for the jury. Tonina denied killing DT, and stated she believed defendant had killed DT because she was tired of being a grandmother and having to constantly babysit him. Tonina also stated that defendant had suffered from mental problems in the past several years, had attempted suicide, and that her daughters had attempted to have her admitted to a mental hospital. Tonina also admitted that she personally suffered from bipolar syndrome and psychosis, and that she had taken antipsychotic medications throughout her adult life. Tonina stated that she went to bed between 9:00 p.m. and 10:00 p.m. on January 10, 2010, and that defendant and DT were together in the

---

[1] Defendant was initially charged with first-degree premeditated murder, MCL 750.316(1)(a), and felony murder, MCL 750.316(1)(b). The trial court ordered three separate mistrials during attempted prosecutions of defendant. On June 8, 2012, a mistrial was declared because an inadmissible statement made by defendant to police was submitted to the jury. Another mistrial was declared because Tonina suddenly became unavailable as a witness. Yet another mistrial was declared because the jury was unable to reach a verdict. (Footnote original).

living room at that time. Tonina awoke at approximately 5:00 a.m. on January 11, 2010, and defendant knocked on her door; defendant stated that she had killed DT. Tonina walked to the bathroom and saw DT floating in the bathtub. Additionally, recorded audio tapes of Tonina's conversations with a police detective were played for the jury; during two of the interviews, she denied killing DT, but in an April 2011 interview, she admitted to killing DT.

During closing arguments, the prosecutor stated:

> And then I heard [defense counsel] stand up here and indicate right off the bat, ... his client is not saying a word in her own defense, she is perfectly happy to fall on the sword. If that were true, she would have pled to it. And I say this, I say let's give her her wish, let's convict her, not because she is a martyr ... but because she is a murderer.

Defendant objected to the prosecutor's statement and requested a curative instruction. The trial court agreed and provided the jury with the instruction that the lawyers' opening statements and closing arguments are not evidence, and also an instruction that the jury should ignore the prosecutor's comments to the effect that defendant should have pleaded guilty. On April 17, 2013, defendant filed a motion for a new trial; defendant argued that the prosecutor's statement during closing argument denied her a fair trial. On June 12, 2013, the trial court denied defendant's motion for a new trial, ruling that the prosecutor's statement was made in direct response to defense counsel's argument that defendant was "falling on a sword and taking the blame for her daughter." Further, the trial court ruled that the prosecutor's statement did not implicate defendant's silence at trial; rather, it implicated defendant's failure to plead guilty.

*People v. Borgia*, No. 316940, 2014 WL 5364173, at *1–3 (Mich. Ct. App. Oct. 21, 2014).

Borgia's conviction was affirmed on appeal. *Id.*, *lv. den.* 497 Mich. 1028 (2015).

Borgia seeks habeas relief on the following grounds:

> I. Petitioner's Fourteenth Amendment was violated when the prosecution failed to produce legally sufficient evidence to identify petitioner as the perpetrator or prove her guilt beyond a reasonable doubt.
>
> II. The prosecutor violated petitioner's state and federal constitutional due process rights to a fair trial by making comments during her closing argument which violated petitioner's right to remain silent.

4

## LEGAL STANDARD

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254(d), imposes the following standard of review for habeas cases:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000). An "unreasonable application" occurs when "a state-court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409. A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 410-11. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). Therefore, to obtain habeas relief in federal court, a state prisoner is required to show that

5

the state court's rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103. A habeas petitioner should be denied relief as long as it is within the "realm of possibility" that fairminded jurists could find the state court decision to be reasonable. *See Woods v. Etherton*, 136 S. Ct. 1149, 1152 (2016).

## DISCUSSION

I. <u>Insufficient Evidence Claim</u>

Borgia contends that there was insufficient evidence to support her conviction. It is beyond question that "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In Re Winship,* 397 U.S. 358, 364 (1970). But the critical inquiry on habeas review is "whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318 (1979). Under *Jackson*, the court must not "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt. Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quotations, citation, and footnote omitted)(emphasis in original).

More importantly, a federal habeas court may not overturn a state-court decision that rejects a sufficiency of the evidence claim simply because the federal court disagrees with the state court's resolution of that claim. Instead, a federal court may grant habeas relief only if the state-court decision was an objectively unreasonable application of the *Jackson* standard. *See Cavazos v. Smith,* 565 U.S. 1, 2 (2011). "Because rational people can

sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold." *Id.* Indeed, for a federal habeas court reviewing a state-court conviction, "the only question under *Jackson* is whether that finding was so insupportable as to fall below the threshold of bare rationality." *Coleman v. Johnson*, 132 S. Ct. 2060, 2065 (2012).

Finally, on habeas review, a federal court does not reweigh the evidence or redetermine the credibility of the witnesses whose demeanor was observed at trial. *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983). It is the province of the factfinder "to weigh the probative value of the evidence and resolve any conflicts in the testimony." *Neal v. Morris*, 972 F. 2d 675, 679 (6th Cir. 1992). A habeas court therefore must defer to the factfinder for its assessment of the credibility of witnesses. *Matthews v. Abramajtys*, 319 F.3d 780, 788 (6th Cir. 2003). The Court does not apply the reasonable doubt standard when determining the sufficiency of evidence on habeas review. *Walker v. Russell*, 57 F. 3d 472, 475 (6th Cir. 1995).

Here, Borgia contends that there was insufficient evidence to establish that she was the person who drowned the victim. On direct review, the Michigan Court of Appeals rejected Borgia's claim:

> Taking the evidence in the light most favorable to the prosecution, a reasonable jury could have concluded that defendant was guilty of first-degree felony murder and first-degree child abuse. Defendant argues that Tonina was responsible for DT's death; specifically, defendant notes that evidence existed that Tonina confessed to the crimes. However, defendant confessed to placing DT in the bathtub to three separate emergency responders on the morning of the offenses. Tonina stated that defendant informed her that she had killed DT before emergency responders arrived. DT was found in the hallway bathroom, not the bathroom attached to Tonina's bedroom. Further, when emergency responders arrived at the apartment,

they found Tonina to be extremely upset and hysterical about DT's condition; however, defendant was calm and did not ask any questions. Taking the evidence in the light most favorable to the prosecution, a reasonable jury could have concluded that defendant drowned DT. Drowning a child constitutes first-degree child abuse because it involves intentionally causing serious harm to a child; if that drowning results in death, the perpetrator is also guilty of first-degree felony murder. Accordingly, sufficient evidence existed to support defendant's convictions.

*People v. Borgia*, 2014 WL 5364173, at *4 (internal citation omitted).

Under Michigan law, "[t]he identity of a defendant as the perpetrator of the crimes charged is an element of the offense and must be proved beyond a reasonable doubt." *Byrd v. Tessmer*, 82 F. App'x. 147, 150 (6th Cir. 2003) (citing *People v. Turrell*, 181 N.W.2d 655, 656 (Mich. Ct. App. 1970)).

The primary evidence against Borgia was her daughter Tonina's testimony that Borgia had confessed to killing DT. "An admission by the accused identifying himself [or herself] as the person involved in the [crime] is sufficient to sustain a guilty verdict when the crime itself is shown by independent evidence." *United States v. Opdahl*, 610 F.2d 490, 494 (8th Cir. 1979); *see, e.g.*, *Johnson v. Coyle,* 200 F.3d 987, 992 (6th Cir. 2000) (petitioner's identity as murderer supported in part by evidence that he confessed several times to murdering sister); *Sok v. Romanowski,* 619 F. Supp. 2d 334, 351 (W.D. Mich. 2008) (petitioner's admissions that placed him at the location of the crime supported sufficiency of identity evidence); *Hatchett v. Withrow*, 185 F. Supp. 2d 753, 759 (E.D. Mich. 2002) (petitioner's identity as perpetrator of crime supported in part by his detailed confession to the crime).

Although in her third statement to the police, Tonina said that she had killed the victim, she denied having anything to do with his death in her first two interviews. Tr. 76–79, ECF No. 6-22. At trial, Tonina denied having anything to do with the victim's death. *Id.* at

8

51, 73. Tonina reiterated that her mother confessed to killing DT. *Id.* at 74. Tonina denied that her mother was covering up for her. *Id.* at 51. [2] Although petitioner's other daughter, Vicky Antishin, testified that Tonina had confessed to killing DT as the two were driving to court, Antishin admitted that Tonina was not on her medications at the time that she made this admission. Tr. 61–62, ECF No. 6-29.

In sum, the jury chose to credit Tonina's testimony that Borgia confessed to killing DT as well as Tonina's testimony in which she denied any involvement in his death. The Court cannot second-guess the factfinder's credibility determination on habeas review.

In addition, circumstantial evidence supported the jury's conclusion that Borgia murdered DT and that Tonina was not the killer. "Circumstantial evidence alone may be sufficient to support a conviction, and it is not necessary for the evidence at trial to exclude every reasonable hypothesis except that of guilt. *Johnson,* 200 F.3d at 992 (alteration and quotations omitted). Moreover, the "[i]dentity of a defendant can be inferred through circumstantial evidence." *See Dell v. Straub*, 194 F. Supp. 2d 629, 648 (E.D. Mich. 2002).

A defendant's erratic and suspicious behavior in the aftermath of a murder is sufficient circumstantial evidence to support a jury's finding that the defendant was the perpetrator. *Johnson,* 200 F. 3d at 992. Several of the first responders—including Clinton Township Fire Chief Mark Turo—testified that Borgia's calm demeanor was inconsistent with the behavior of a family member whose child has been killed or injured. Chief Turo

---

[2] Respondent claims that Tonina clarified that her confession during the third interview was untrue. *See* Response 28, ECF No. 5 (citing Tr. 51, ECF No. 6-22). Although Tonina's testimony substantively contradicted her prior confession, the Court has reviewed the transcript page cited by Respondent and has not found that Tonina specifically referenced her third interview.

testified to the circumstances that he and the firefighters encountered upon arriving at Borgia's residence:

> In my almost 25 years [as a fireman] I have responded on dozens and dozens of calls involving children, both drowning victims, children that are not breathing, and never before have I ever pulled up on a scene in any fashion and nobody outside screaming frantic. It was—it was just very unusual.

Tr. 92, ECF No. 6-27.

Chief Turo indicated that it took Borgia ten to fifteen seconds to answer the door, which he also found disconcerting: "Like I said, it was unusual, the door was locked and nobody was waiting for us." *Id.* at 92–93. Chief Turo also testified that Borgia was very calm, and was not frantic or hysterical. *Id.* at 93. Borgia did not ask Chief Turo any questions about DT or his condition. *Id. at* 93–94, 101–02.

Another responder, Officer Preston Susalla of the Clinton Township Police Department, testified that Tonina's hysterical behavior was consistent with the relative of a dead or injured child. Officer Susalla testified that when he arrived at the location, Tonina was "hysterical." *Id.* at 153. By contrast, Borgia had "no emotion, didn't have any concern over the situation." *Id.* at 154. Officer Susalla testified that Tonina's behavior was consistent with reactions of parents or family members who witness a child get killed or injured, while Borgia's reaction was not consistent with a normal reaction from a family member to the death of a child. *Id.* at 179–81. The jury could have easily inferred from Borgia's calm, almost apathetic demeanor that she was the actual killer.

Finally, the Court notes that although Borgia did not admit to drowning DT, she told three separate first responders that she placed DT in the bathtub. DT was found in the hallway bathroom, not the bathroom attached to Tonina's bedroom. This additional

circumstantial evidence may have further suggested to the jury that Borgia was the actual killer.

A federal court reviewing a state-court conviction on habeas review that is "faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Cavazos*, 565 U.S. at 7 (quoting *Jackson*, 443 U.S. at 326). Although Tonina attempted to later take responsibility for DT's death, the jury could have discounted her story based on the fact that she was not taking her anti-pyschotic medications at the time that she made these admissions, and because she was extremely upset at the crime scene concerning the victim's condition, whereas Borgia was not. The jury could have also rejected the theory that Tonina was the real killer based on the fact that Borgia admitted to placing the victim in the bathtub and that the victim was found in the hallway bathroom, not Tonina's bathroom. Because there were multiple pieces of evidence to establish petitioner's identity as the person who drowned DT, the Michigan Court of Appeals did not unreasonably apply *Jackson* in rejecting petitioner's sufficiency of evidence claim. *See Moreland v. Bradshaw*, 699 F.3d 908, 919–21 (6th Cir. 2012).

To the extent that Borgia challenges the credibility of the prosecution witnesses, she is not entitled to relief. "Attacks on witness credibility are simply challenges to the quality of the prosecution's evidence, and not to the sufficiency of the evidence." *Martin v. Mitchell*, 280 F.3d 594, 618 (6th Cir. 2002) (quotations omitted). An assessment of the credibility of witnesses is generally beyond the scope of federal habeas review of sufficiency of evidence claims. *Gall v. Parker*, 231 F. 3d 265, 286 (6th Cir. 2000). The mere existence of sufficient

11

evidence to convict therefore defeats a petitioner's claim. *Id.* Any insufficiency of evidence claim that rests on an allegation of the witnesses' credibility, which is the province of the finder of fact, does not entitle a habeas petitioner to relief. *See Tyler v. Mitchell,* 416 F. 3d 500, 505 (6th Cir. 2005). Borgia is not entitled to relief on her first claim.

II.     Prosecutorial Misconduct Claim

Borgia contends that the prosecutor committed misconduct by commenting improperly on her decision not to testify:

> And then I heard [defense counsel] stand up here and indicate right off the bat, ... his client is not saying a word in her own defense, she is perfectly happy to fall on the sword. If that were true, she would have pled to it. And I say this, I say let's give her her wish, let's convict her, not because she is a martyr ... but because she is a murderer.

Tr. 108–09, ECF No. 6-29. "Claims of prosecutorial misconduct are reviewed deferentially on habeas review." *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004). A prosecutor's improper comments will be held to violate a criminal defendant's constitutional rights only if they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quotations omitted). Prosecutorial misconduct will thus form the basis for habeas relief only if the conduct was so egregious as to render the entire trial fundamentally unfair based on the totality of the circumstances. *Donnelly v. DeChristoforo*, 416 U.S. 637, 643–45 (1974). In order to obtain habeas relief on a prosecutorial misconduct claim, a habeas petitioner must show that the state court's rejection of his prosecutorial misconduct claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Parker v. Matthews*, 567 U.S. 37 (2012) (per curiam) (quoting *Harrington*, 562 U.S. at 103).

In *Griffin v. California*, 380 U.S. 609 (1965), the United States Supreme Court held that neither the court nor the prosecutor may invite the jury to infer guilt from the defendant's decision not to testify. They may not "solemnize [ ] the silence of the accused into evidence against him," *id.* at 614, or "suggest[ ] to the jury that it may treat the defendant's silence as substantive evidence of guilt." *Baxter v. Palmigiano*, 425 U.S. 308, 319 (1976).

When a prosecutor's remark or statement indirectly comments on a habeas petitioner's decision not to testify, a court applies four factors to evaluate the statement: "1) Were the comments manifestly intended to reflect on the accused's silence or of such a character that the jury would naturally and necessarily take them as such; 2) were the remarks isolated or extensive; 3) was the evidence of guilt otherwise overwhelming; 4) what curative instructions were given and when." *Bowling v. Parker*, 344 F.3d 487, 514 (6th Cir. 2003) (quotations omitted). As to the first factor, a court should not find a manifest intent to comment on the right to remain silent if some other explanation for the prosecutor's remarks is equally plausible, such as when a comment is a "fair response to a claim made by [the] defendant or his counsel." *See Gall*, 231 F. 3d at 311 (quotations and citation omitted). The Michigan Court of Appeals rejected Borgia's claim for exactly that reason:

During defendant's closing argument, defense counsel stated:

> You've sat, you've watched [defendant] for this past week sitting there like a lump of mush, not lifting a finger, not saying a word in her own defense. Why do you suppose that is? [Defendant] has a death wish of sorts. She is perfectly happy, and what you see now it's been like that for three years, she is perfectly happy to fall on the sword and go to the Pope to spare her daughter. Maybe you wouldn't do that, maybe I wouldn't do that. That's her choice, and her decision.

13

> I am not going to let that happen. From the first time a policeman walked into her apartment on that January morning, that's been her attitude and it hasn't changed over the three years. I did it, it is me, take me.
>
> * * *
>
> Although the prosecutor did mention that defendant failed to testify, by highlighting that she had not said anything in her own defense, the context indicates that the prosecutor was merely reiterating and responding to defense counsel's assertion that defendant was taking the blame for an offense she did not commit. The crux of the prosecutor's statement was that defendant could have pleaded guilty to the charged offenses if she wished to be convicted instead of Tonina; it was not an attempt to shift the burden of proof to defendant. In the context of the trial, the prosecutor's statement was isolated and in direct response to the theory of defense counsel: that defendant was falsely taking the blame for Tonina.

*People v. Borgia*, 2014 WL 5364173, at * 5.

The Court agrees. The prosecutor's remarks were a fair response to defense counsel's argument that Borgia was attempting to take the blame for a murder she did not commit. *See United States v. Beverly,* 369 F.3d 516, 543–44 (6th Cir. 2004) (finding no misconduct from prosecutor's statement "why [defendant] did what he did, only he can answer" that responded to defense counsel's prior argument that defendant did not flee from arrest); *Burton v. Phillips,* 64 F. Supp. 2d 669, 684 (E.D. Mich. 1999) (finding no misconduct from prosecutor's statement "[t]here are secrets locked up in this [defendant]" that responded to defense counsel's prior argument "that the prosecutor could not really say what happened the night of the killings because he (the prosecutor) was not present") (footnote omitted) (alteration in original). Therefore, the prosecutor's comments did not violate Borgia's Fifth Amendment privilege against self-incrimination.

In addition, Borgia would not be entitled to habeas relief on this claim, because the prosecutor's remarks were neither "flagrant nor repeated." *Joseph v. Coyle,* 469 F.3d 441,

14

474 (6th Cir. 2006). Borgia would finally not be entitled to habeas relief on this claim, in light of the trial court's curative instruction to the jury about petitioner's right not to testify and that it must not affect their verdict. Tr. 117, ECF No. 6-29; *see also Coyle*, 469 F.3d at 474.

III. <u>Certificate of Appealability</u>

Before a petitioner may appeal the denial of a habeas petition, the Court must determine if the petitioner is entitled to a Certificate of Appealability (COA). 28 U.S.C. § 2253(c)(1)(a); *see also* Fed. R. App. P. 22(b). The Court must either issue a certificate of appealability indicating which issues satisfy the required showing or provide reasons why such a certificate should not issue. 28 U.S.C. § 2253(c)(3); Fed. R. App. P. 22(b). A COA may be issued "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The substantial showing threshold is satisfied when a petitioner demonstrates "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quotations omitted).

In applying the above standard, a district court may not conduct a full merits review of the petition. *Miller-El v. Cockrell*, 537 U.S. 322, 336–37 (2003). Instead, "[w]hen a habeas applicant seeks a COA," a federal court should "limit its examination to a threshold inquiry into the underlying merit of his claims." *Id.* at 323. "The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rules Governing § 2254 Cases, Rule 11(a), 28 U.S.C. foll. § 2254; *see also Strayhorn v. Booker,* 718 F. Supp. 2d 846, 875 (E.D. Mich. 2010).

After conducting the required inquiry, and for the reasons stated in the order above, the Court finds that Borgia has not made a substantial showing of the denial of a constitutional right. *See* 28 U.S.C. § 2253(c)(2). Borgia should not receive any encouragement to proceed further. *Slack*, 529 U.S. at 484. Because the Court can discern no good-faith basis for an appeal, *see Miller-El*, 537 U.S. at 338, any appeal would be frivolous. The Court will therefore deny a certificate of appealability. The Court will also deny petitioner leave to appeal in forma pauperis, because the appeal would be frivolous. *See Hence v. Smith*, 49 F. Supp. 2d 547, 549 (E.D. Mich. 1999).

## ORDER

**WHEREFORE**, it is hereby **ORDERED** that the petition for a writ of habeas corpus [1] is **DENIED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that a certificate of appealability is **DENIED**.

**IT IS FURTHER ORDERED** that petitioner will be denied leave to appeal in forma pauperis.

**IT IS FURTHER ORDERED** that this case is **DISMISSED WITH PREJUDICE**.

**SO ORDERED**.

s/Stephen J. Murphy, III
STEPHEN J. MURPHY, III
United States District Judge

Dated: February 24, 2017

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on February 24, 2017, by electronic and/or ordinary mail.

s/David P. Parker
Case Manager